UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SHAWNI L. TIREY,**

    **Plaintiff,**

                                  **Civil Action 2:12-cv-80**
    v.                           **Judge George C. Smith**
                                **Magistrate Judge Elizabeth P. Deavers**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**


## REPORT AND RECOMMENDATION

Plaintiff, Shawni L. Tirey, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 15), and the administrative record (ECF No. 11). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the administrative law judge under Sentence Four of § 405(g).

### I. BACKGROUND

Plaintiff filed her application for benefits on June 25, 2008, alleging that she has been disabled since April 15, 2008, at age 53, due to anxiety and panic attacks. (R. at 166–67.) She had previously been employed as a sales attendant, receptionist, and type-setter. The Social Security Administration initially denied her application and again upon reconsideration.

Plaintiff requested a *de novo* hearing before an administrative law judge.

On July 27, 2011, Administrative Law Amelia Lombardo ("ALJ") held a video hearing at which Plaintiff, represented by counsel, appeared and testified. A vocational expert also appeared and testified. On April 8, 2011, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 11–18.) In November 2011, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-4.) Plaintiff then timely commenced the instant action.

## II. HEARING TESTIMONY

### A. Plaintiff's Testimony

At the time of the hearing, Plaintiff lived with her husband. (R. at 50.) She testified that she had a driver's license and continues to renew it, but does not drive. (R. at 32.) Plaintiff has two daughters. Her youngest daughter visits several times per week and assists her with household chores. Plaintiff testified that her typical day includes waking around 11:30 a.m. or noon and napping again around 2:00 p.m. (R. at 55.) She reported that she is unable to sleep more than four or five hours per night. (R. at 53.) When awake, she does some chores, occasionally gets dressed, and watches television. (R. at 55.)

Plaintiff indicated that she worked as a type-setter at Harper Engraving until she was terminated on May 21, 2008. (R. at 51–52.) She testified that she was terminated for missing too much work, which she attributed to her anxiety. (R. at 52.) She also testified that she had experienced difficulty focusing and problems with her short-term memory prior to her termination. (R. at 61.)

Plaintiff described her anxiety as ever-present. (R. at 56.) She testified that everyday is

difficult. She further indicated that the "hard part" is "[j]ust getting out of bed" and "[m]aking herself . . . do anything at all." (*Id*.) She testified that the symptoms of her anxiety include a fast heartrate, a spinning room, and feeling hot and sick. (R. at 52.) She began experiencing these symptoms in 2005. (R. at 56.) Plaintiff testified that she experiences panic attacks, on average, three to five times per week, each lasting twenty to thirty minutes. (R. at 58–59.) After an attack, she needs to lay down for "around an hour or so." (R. at 59.) Triggers include leaving the house and riding in cars. (*Id*.) Plaintiff explained that she is "scared to leave the house" and that she cannot "even walk to [her] mailbox and get [her] mail." (R. at 56, 58.) She testified that her medication has helped and her condition has improved since 2008 when she stopped working. (R. at 53, 60.) Plaintiff explained that she has not sought treatment from a psychiatrist because she does not have insurance. (R. at 53.) She acknowledged, however, that she has not gone to her community mental health center or otherwise sought therapy for her condition. (R. at 53.)

**B.      Vocational Expert Testimony**

Eric Pruitt testified as a vocational expert at the administrative hearing. (R. at 49–52.) The ALJ asked Mr. Pruitt to consider a person of Plaintiff's age, educational background, and work experience with no particular exertional limitations who was limited to unskilled, low-stress work such that she could not perform jobs with assembly-line production quotas or that were fast paced, and could have only minimal contact with the general public. (R. at 64.) Based on this hypothetical, Mr. Pruitt testified that such an individual could not perform Plaintiff's past work as a type-setter because such a position had production expectations. (R. at 64–65.) He added that her other past employment as a sales attendant and receptionist would also be precluded due to the need for the worker to be exposed to the public in those positions. (R. at

65.) Mr. Pruitt testified that the hypothetical individual would be able to perform a variety of medium unskilled jobs. (*Id*.) Examples included laundry laborer, groundskeeper, and commercial cleaner. (*Id*.) Mr. Pruitt testified that cumulatively, approximately 36,000 positions at the medium, unskilled level existed in the region that the hypothetical individual could perform. (R. at 66.) If that same individual, however, needed to miss more than three days every month and was unable to maintain productivity, attention to detail, and attention to task approximately twenty or twenty-five percent of the day, they would not be employable. (R. at 66–67.)

## III.   MEDICAL RECORDS

### A.   Kevin Olson, D.O.

On November 21, 2008, Dr. Olson, Plaintiff's primary care physician, completed a Psychiatric/Psychological Impairment Questionnaire in connection with Plaintiff's application for benefits. (R. at 393–400.) On this form, he noted that he began treating Plaintiff in 1989 and that he currently treats her monthly. (R. at 393.) He listed her diagnoses as panic attacks, insomnia, and generalized anxiety disorder. (*Id*.) Under the statement on the form reading "[i]dentify the positive clinical findings that demonstrate and/or support your diagnosis," Dr. Olsen marked the lines next to the following symptoms: "Poor memory"; "Appetite disturbance with weight change"; "Sleep disturbance"; "Mood disturbance"; "Emotional lability"; "Recurrent panic attacks"; "Feelings of guilt/worthlessness"; "Difficulty thinking or concentrating"; "Social withdrawal or isolation"; "Blunt, flat or inappropriate affect"; "Decreased energy"; "Obsessions or compulsions"; "Persistant irrational fears"; "Generalized persistent anxiety"; "Somatization unexplained by organic disturbance"; and "Hostility and

irritability." (R. at 394.) Dr. Olson reported that Plaintiff's primary symptoms included anxiety and panic attacks, but noted that she was "[g]ood on meds." (R. at 395.) He indicated that he was not aware of any time that Plaintiff required hospitalizations or emergency room treatment for her symptoms. (*Id*.) He assigned her a current Global Assessment of Functioning ("GAF") score of 60, but noted that her lowest GAF score in the past year was 40.[1] (*Id*.) Dr. Olson marked boxes indicating that he found Plaintiff to be "markedly limited" in all areas relating to understanding and memory, social interactions, and adaptation and in most areas relating to sustained concentration and persistence. (R. at 395–98.) He further opined that Plaintiff was incapable of tolerating even low stress and would miss more than three days per month because of her mental impairments. (R. at 399–400.) Finally, Dr. Olson represented that Plaintiff had experienced these symptoms and limitations since "roughly 2004." (R. at 400.)

In April 2009, Dr. Olson wrote a letter to Plaintiff's attorney stating that it was his "professional opinion, with a high degree of medical certainty that [Plaintiff] is permanently and totally disabled" from "hypothyroidism, [gastroesophageal reflux disease], and generalized anxiety disorder." (R. at 403–04.)

In October 2010, Dr. Olson drafted a "To Whom it May Concern" letter in which he again opined that Plaintiff had marked mental limitations, was incapable of even low stress

---

[1] The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning. Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at pp. 32-34 ("DSM-IV-TR"). A GAF score of 60 is at the high end of the 51-60 range, which is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. A GAF score of 40 is at the high of the 31-40 range and is indicative some impairment in reality testing or communication or major impairment in several areas. *Id.* at 34.

5

work, would miss more than three days of work each month because of her impairments, and was "permanently and totally disabled." (R. at 436–37.) In this correspondence, Dr. Olson again stated that Plaintiff's symptoms and consequent limitations became this severe in 2004. (*Id*.)

**B. Sudhir Dubey, Psy.D.**

Plaintiff reported to Dr. Dubey, a psychologist, for an consultative examination on August 26, 2008. Plaintiff denied previous psychiatric treatment at this time with the exception of obtaining a prescription for medication from her primary care physician. (R. at 372.) Dr. Dubey described Plaintiff as consistent, credible, reliable, and an accurate historian. (R. at 373–74.) He observed that Plaintiff presented with a stooped posture, tense facial expressions, and decreased motor activity. (R. at 373.) He described her affect as appropriate and her emotional reactions as gloomy and anxious. (*Id*.) Dr. Dubey found her thought processes to be coherent and logical. (*Id*.)

Upon completion of his examination, Dr. Dubey diagnosed Plaintiff with generalized anxiety disorder and assigned her a GAF score of 65.[2] (R. at 375.) He opined that Plaintiff had only mild impairments in her ability to understand, remember, and follow instructions. (*Id*.) He explained that Plaintiff was able to understand the questions posed to her and was able to carry out simple instructions, but that she evidenced memory deficits during the assessment as evidenced by her performance on the mental status exam. (*Id*.) Dr. Dubey further opined that Plaintiff had mild impairments in her ability to maintain attention, concentration, persistence, and pace to perform repetitive tasks; her ability to relate to others, including fellow workers and

---

[2]A GAF score of 65 is indicative of some mild symptoms or some difficulty in social, occupational, or school functioning. DSM-IV-TR at 34.

supervisors; and her mental ability to withstand stress and pressure associated with day-to-day work activity. He explained that Plaintiff demonstrated problems of attention and concentration on simple and direct tasks as evidenced by her performance on the mental status exam and that she also demonstrated deficits during the interview and examination. He also noted that even though she exhibited some anxiety and tension, she was able to relate to the examiner. (R. at 375–76.) He opined that "[i]t is quite likely that in the work environment, when faced with dealing with others and expectations, [Plaintiff] would have some mild difficulty being able to complete tasks given." (R. at 376.) Finally, Dr. Dubey opined that Plaintiff had the mental ability to manage her own funds. (R. at 376.) He explained that Plaintiff's judgment as to prioritizing her activities in order to maintain the most basic functions appeared to be appropriate. (*Id*.)

C.     Alice Chambly, Psy.D. & Bruce Goldsmith Ph.D.

Dr. Alice Chambly reviewed Plaintiff's medical records in September 2008 and opined that Plaintiff had "no more than mild limitations in her functioning." (R. at 390.) She opined that Plaintiff had the impairment of generalized anxiety disorder, but that it was not a severe impairment. (R. at 378, 383, 390.) Dr. Chambly noted that Plaintiff had maintained steady employment in the past; lived in an apartment alone; was able to take care of her cat; had no difficulties maintaining her personal care; was able to prepare meals and do house and yard work; was able to shop, watch television, sew, and read; spent time with others and had no problem getting along with others; and could follow instructions. (R. at 390.) Dr. Chambly further noted that during Plaintiff's examination with Dr. Dubey, she spoke coherently, expressed logical progression of goals to ideas; had intelligible and appropriate speech, exhibited

an affect appropriate to the content of the interview; denied crying spells; exhibited oriented, alert, and responsive behavior; denied trouble concentrating and remembering; recalled six digits forward and three backwards; and was able to recall two of three objects after a five-minute delay.  (*Id*.)  Dr. Chambly found Plaintiff's allegations to be only partially credible.  (*Id*.)

In December 2008, Dr. Goldsmith reviewed Plaintiff's medical records, including Dr. Olson's opinion, and agreed with Dr. Chambly's assessment that Plaintiff had the impairment of generalized anxiety disorder, but that it was not a severe impairment.  (R. at 402.)

### IV.  THE ADMINISTRATIVE DECISION

On April 8, 2011, the ALJ issued her decision.  (R. at 11–18.)  At step one of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantially gainful activity since April 15, 2008.[3]  (R. at 13.)  At step two, the ALJ found that "[t]here are no medical signs or laboratory findings to substantiate the existence of a medically determinable

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

impairment." (R. at 13.) Within her decision, the ALJ assigned "great weight" to Dr. Dubey's opinion; "significant weight" to the opinions of Drs. Chambly and Goldsmith; and "little weight" to Dr. Olson's assessments. (R. at 14–17.) She found Plaintiff's allegations to be "disproportionate and less than credible." (R. at 17.) Based upon her finding that Plaintiff had no medically determinable impairment, the ALJ concluded that Plaintiff was not disabled and terminated her analysis at step two. (R. at 17–18.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.　ANALYSIS

As set forth above, the ALJ terminated her analysis at step two, premising her nondisability finding upon her conclusion that the record contains "no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment." (R. at 13, 17.)  Within her Statement of Errors, Plaintiff submits that the ALJ:  (1) erred in finding that she had no severe impairments; (2) violated the treating physician rule; and (3) erred in evaluating Plaintiff's credibility.  Within these contentions of errors, Plaintiff posits that the ALJ's finding that she has no medically determinable impairments is internally inconsistent with other portions of her opinion and is not supported by substantial evidence.  The Undersigned concludes that the ALJ's termination of her analysis based upon the purported lack of acceptable evidence substantiating an impairment constitutes reversible error.[4]

The United States Court of Appeals for the Sixth Circuit has described step two of the sequential process as follows:

---

[4]This finding obviates the need for in-depth analysis of Plaintiff's remaining assignments of error.  Thus, the Undersigned need not, and does not, resolve the alternative bases that Plaintiff asserts support reversal and remand.  Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignments of error if appropriate.

> At step two, an ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." [20 C.F.R. §§ 404.1520a(a) and 404.1520a(b)(1)]. If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id*. at §§ 404.1520a(b)(2), (c)(3). These four functional areas are commonly known as the "B criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 *et seq*.; *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008). The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using the following four-point scale: none, one or two, three, four or more. *Id*. If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. *Id*. at § 404.1520a(d)(1). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. *See id*. § 404.1520a(d)(2).

*Rabbers*, 582 F.3d at 652–53. Thus, if no signs or laboratory findings substantiate the existence of an impairment, it is appropriate to terminate the disability analysis. *See* SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996) ("In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process set out in 20 CFR 404.1520 and 416.920 . . . .").

Here, the ALJ's finding that "no medical signs or laboratory findings . . . substantiate the existence of a medically determinable impairment" suggests that she either misinterprets the signs and findings necessary to show a medically determinable mental impairment or that she failed to consider all of the evidence in the record. In her opinion, the ALJ correctly notes that the "existence of an impairment [cannot] be established on the basis of symptoms alone." (R. at 13.); SSR 96-4p, 1996 WL 374187, at *2 (July 2, 1996) ("No symptom or combination of symptoms by itself can constitute a medically determinable impairment.")  "[S]ymptoms" consist

11

of a claimant's description of his or her alleged impairment. 20 C.F.R. § 404.1528(a). In contrast, "signs" include "psychological abnormalities which can be observed." 20 C.F.R. § 404.1528(a)-(b). In addition, "[p]sychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception." 20 C.F.R. § 404.1528(a)-(b). "Laboratory findings" include "psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." *Id*. Consistently, the Sixth Circuit has advised that "[w]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology." *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (internal quotation marks and citations omitted).

Applying the foregoing, Dr. Dubey, Psy.D., who is trained in the field of psychopathology, offered acceptable "signs" and "findings" in the form of observations and diagnostic tests to support his diagnosis of generalized anxiety disorder. (*See* R. at 371–76.) Specifically, Dr. Dubey references "performance of the mental status exam" and indicates that he observed the following abnormalities, among others: stooped posture, poverty of speech, decreased motor activity, tense facial expression, depressed appearance, minimal eye contact, and gloomy and anxious emotional reactions. (*Id*.) Moreover, Drs. Olson, Chambly, and Goldsmith likewise concluded that Plaintiff suffered from the impairment of generalized anxiety disorder. Thus, the Undersigned concludes that the ALJ erred in finding that "no medical signs

or laboratory findings . . . substantiate the existence of a medically determinable impairment."[5]

Whether or not the ALJ's error is harmless presents a closer call. Despite her finding of no medically determinable impairment,[6] the ALJ proceeded to evaluate Drs. Olson, Dubey, Chambly, and Goldsmith's opinions concerning Plaintiff's functionality. She accords Dr. Dubey's opinion that Plaintiff has only mild impairments in work-related functions "great weight" and Drs. Chambly and Goldsmith's opinions that Plaintiff's mental impairment is "non-severe" "significant weight," explaining that these opinions "accurately assess the claimant's mental functional capacity." (R. at 15.) Thus, any error could arguably be characterized as

---

[5]Significantly, in her decision, the ALJ failed even to mention any of the abnormalities Dr. Dubey observed and did not offer any explanation for why she did not consider his findings and observations to substantiate the existence of a medically determinable impairment. *See Rogers*, 486 F.3d at 248 n.5 (quoting *Hurst v. Sec'y of Health & Hum. Servs.*, 753 F.2d 517, 519 (6th Cir. 1985)) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review."); *Reynolds v. Comm'r of Soc. Sec.*, No. 09–2060, 2011 WL 1228165, at *2 (6th Cir. Apr. 1, 2011) (quoting 5 U.S.C. § 557(c)(3)(A)) ("Importantly, an ALJ must include a discussion of 'findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record.' The reasons requirement is both a procedural and substantive requirement, necessary in order to facilitate effective and meaningful judicial review.").

[6]The ALJ's decision is confusing in that she appears to contradict her finding of no medically determinable impairment as she sums up her evaluation of Plaintiff's credibility:

> In sum, after careful consideration of the evidence, the undersigned finds that *the claimant's medically determinable impairments* could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible.

(R. at 17 (emphasis added).) The very next sentence in her opinion, which also happens to be the concluding sentence of her step two analysis, however, makes clear that her reference to "medically determinable impairments" within her credibility analysis was simply an unintentional boilerplate byproduct: "Accordingly, there are no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment." (*Id.*)

13

harmless because even if the ALJ had concluded that Plaintiff had a medically determinable impairment, she would have found it to be non-severe, resulting in a nondisability determination.

The Undersigned declines to find harmless error for two reasons.  First, in assessing Plaintiff's functional limitations, the ALJ must "consider all relevant and available clinical signs and laboratory findings . . . ."  20 C.F.R. § 404.1520a(c)(1).  Thus, the ALJ's erroneous finding that no such "signs" and "findings" exist infects her consideration of Plaintiff's functionality.  *See Saterlee v. Astrue*, 450 F. App'x 753, 756 (10th Cir. 2011) (holding that the ALJ's erroneous threshold finding of no medically determinable hand impairment could not be remedied by a subsequent determination that impairment did not cause work-related limitation because the subsequent determination "would still [be] tainted by . . . [t]he ALJ's mistaken view that there was no medical evidence of an underlying condition"); *see also Bolden v. Astrue*, No. 3:09-cv-457, 2010 WL 3522309, at *5–6 (E.D. Tenn. Aug. 16, 2010) (rejecting the Commissioner's argument that the ALJ's erroneous finding of no medically determinable impairment was harmless where the ALJ's decision offered a severity analysis, explaining that "[t]he ALJ's analysis [concerning severity] at step two simply does not comport with his finding [of no medically determinable impairment], and his finding is controverted by the evidence in the record").

Second, this is not the case where the evidence is so lacking that the severity requirement simply cannot be satisfied.  The Sixth Circuit "construe[s] the step two severity regulation as a '*de minimis hurdle*' in the disability determination process" that is utilized "to screen out 'totally groundless claims.'"  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) and *Farris v. Sec'y of HHS*, 773

F.2d 85, 89 (6th Cir. 1985)). Consistently, even if only mild limitations in the first three functional areas are noted, the adjudicator must still conclude that an impairment is severe where "the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d); *see also Griffeth*, 217 F. App'x at 428 (explaining that the ALJ's characterization of an impairment as "severe" even though he found it caused only mild limitations was not necessarily inconsistent); *Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) ("[C]ontrary to [the claimant's] assertions, the ALJ's finding that [her] degenerative disc disorder was a severe impairment at step two of the sequential evaluation does not contradict the ALJ's conclusion that the disorder's impact on her functioning was mild. Step two of the sequential evaluation is a threshold question with a *de minimis* severity requirement."). Thus, Dr. Dubey's opinion standing alone could serve as a basis for concluding that Plaintiff's mental impairment is sufficiently severe to proceed beyond step two. Indeed, when the ALJ posed a hypothetical question to the VE incorporating limitations to address Dr. Dubey's opinions that Plaintiff would be mildly impaired in her ability to withstand stress and relate to others, the VE testified that such an individual could not perform any of Plaintiff's past three jobs. (R. at 64–65.) *See* SSR 85-28 ("If the medical evidence establishes only a slight abnormality(ies) which has no more than a minimal effect on a claimant's ability to do basic work activities, but evidence show that the person cannot perform his or her past relevant work because of the unique features of that work, a denial at the 'not severe' step of the sequential evaluation is inappropriate.").

     In sum, Undersigned concludes the ALJ failed to follow agency guidelines and the applicable law such that her decision at step two of the procedure outlined in 20 C.F.R. §

404.1520 is not supported by substantial evidence. It is, therefore, recommended that the Court remand this action for a determination of whether Plaintiff's medically determinable impairment of generalized anxiety disorder constitutes a severe impairment for the purposes of 20 C.F.R. § 416.920(a)(4)(ii).

## VII.  CONCLUSION

Due to the errors outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g). Accordingly, the Undersigned **RECOMMENDS** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.  PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  February 5, 2013                                                    /s/ *Elizabeth A. Preston Deavers*
                                                                                                 Elizabeth A. Preston Deavers
                                                                                                  United States Magistrate Judge